## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No.  06-280 (ESH)** |
| | : | |
| **MEHRZAD ARBANE,** | : | |
| | : | |
| **Defendant.** | : | |

## MOTION TO DISMISS INDICTMENT

The defendant, Mehrzad Arbane, respectfully moves to dismiss the indictment in this case.  As grounds for this motion, Mr. Arbane submits that the indictment should be dismissed because it:  (1) violates the Double Jeopardy clause; (2) is barred by the doctrine of collateral estoppel and the statute of limitations; and (3) is the result of vindictive prosecution.  An evidentiary hearing on this motion is respectfully requested.

## FACTS

**A.**    **Introduction**

The charges in this case related to events surrounding Mr. Arbane's arrest in Ecuador by Ecuadorian authorities on January 8, 2002.  An amount of cocaine was allegedly found in an apartment at a building where Mr. Arbane was arrested.  Mr. Arbane was tried in Ecuador on drug charges related to the seizure and was acquitted.  He was subsequently tried in Miami on charges involving the same drugs – after being convicted at trial, his conviction was reversed by the Eleventh Circuit because there was insufficient evidence to support it.  Shortly after this reversal, he was indicted on the present charges, which also involve the same seizure of drugs.  Thus, this case represents the third attempt to convict Mr. Arbane regarding the drugs found over five years ago in Ecuador.

**B.**    **The Charges in Ecuador**

On January 8, 2002, Mr. Arbane was arrested in Guayaquil, Ecuador, by Ecuadorian authorities and charged with drug possession offenses. At an apartment in a building where Mr. Arbane was arrested, over 250 kilograms of cocaine were allegedly found, as well as material for packaging it. On March 11, 2003, Mr. Arbane was acquitted by an Ecuadorian Criminal Tribunal. He was subsequently ordered deported to his native country of Iran. His deportation to Iran was routed on a flight though Houston.

**C.**    **The Charges in the Northern District of New York**

On April 14, 2003, Mr. Arbane was arrested in Houston, after arriving at the airport on a stopover to Iran, pursuant to a criminal complaint and arrest warrant in the Northern District of New York ("NDNY"). According to the docket of the case in the NDNY, the complaint and warrant were filed on January 11, 2002, charging Mr. Arbane with one count of Bringing and Harboring Aliens, in violation of 8 U.S.C. § 1324(f). At his initial appearance in the Southern District of Texas, Mr. Arbane waived his right to an identity hearing and detention hearing; he was thus ordered removed to the NDNY. On May 1, 2003, Mr. Arbane made his initial appearance in the NDNY. On May 7, 2003, the government's motion for detention was granted and Mr. Arbane was ordered held without bond. An indictment was filed on May 14, 2003, which was then superceded on August 20, 2003. The superceding indictment charged Mr. Arbane with four counts of Bringing and Harboring Aliens, in violation of 8 U.S.C. § 1324(f).

In a bizarre order, the docket sheet for the NDNY reflects that on August 25, 2003, the district ordered that Mr. Arbane be released on his own recognizance on October 1, 2003, to face a pending charge in the Southern District of Florida, along with an immigration detainer. On

October 1, 2003, conditions of release were set for Mr. Arbane, and on October 20, 2003, he was released on his own recognizance on the NDNY charges.[1]  On October 29, 2003, the district court in NDNY stayed the proceedings against Mr. Arbane pending his return to the NDNY from the Southern District of Florida ("SDF").  Further, the district court excluded the speedy trial time until Mr. Arbane returns to the NDNY.  Thus, the NDNY charges are still pending, four years after his initial appearance there.

## D.     The Charges in the Southern District of Florida

### 1.     The District Court

On May 1, 2003, a criminal complaint was filed in U.S. Magistrate Court for the SDF in Criminal Case No. 03-M-2594, charging Mr. Arbane with conspiracy to import cocaine.  An arrest warrant was issued on the same day.

On September 18, 2003, a one-count indictment, in addition to a forfeiture provision in violation of 21 U.S.C. § 853, was filed in the SDF.  The indictment charged that from on or about October 2001 continuing through January 8, 2002 (the date of Mr. Arbane's arrest in Ecuador), in Miami-Dade County, in the SDF, and elsewhere, Mr. Arbane knowingly and intentionally conspired with others to import into the United States five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 952(a), 963 and 960(b)(1)(B).

On October 1, 2003, Mr. Arbane appeared in the SDF and was ordered held without bond pending trial.  On May 6, 2004, a jury trial began and on May 14, 2004, the jury found Mr. Arbane guilty of the charge.  On May 24, 2004, the government's motion to dismiss the forfeiture

---

[1]  Mr. Arbane was, of course, not actually released from custody, but was brought in custody to the Southern District of Florida.

count of the Indictment was granted.  Motions for a mistrial and a new trial were denied and on

October 29, 2004, Mr. Arbane was sentenced to 235 months incarceration, a five year term of

supervised release, and a special assessment of $100.00.

### 2.    The Eleventh Circuit

On April 21, 2006, the Eleventh Circuit, in United States v. Arbane, 446 F.3d 1223 (11th

Cir. 2006), held that the evidence was insufficient to show that anyone other than a government

informant was involved in the alleged conspiracy, and thus reversed the conviction.  The

Eleventh Circuit began its analysis by stating that the "evidence of the charged conspiracy in this

case was presented only through the testimony of the confidential informant Jose Jamo Velez."

Id. at 1226 (footnote omitted).  Velez testified that he met Arbane in 1999 and they engaged in

various illegal conduct throughout Central America, South America, and Mexico.  Id.  According

to Velez's testimony, in the years 1999 and 2000, Velez and Arbane shipped drugs from Ecuador

to Mexico, Mexico to Guatemala, Guatemala to Panama, and from Panama to Ecuador.  Id.  In

early 2000, Velez and Arbane bought and shipped cocaine from Ecuador to Mexico, where they

sold some of their cocaine to Jose Luis Jimenez, known as the "Engineer."  Id.  The Engineer

transported these drugs to New York in the spring of 2000.  Id.  There were two other instances

in 2000 where the Engineer imported to the United States the drugs sold to him by Velez and

Arbane.  Id.  The last instance involving any sale to the Engineer and the transportation of these

drugs to the United States occurred in 2000.  Id.

The Engineer was arrested in June of 2001.  Id. at 1227-8.  He was the "only conduit"

Velez and Arbane "used to bring drugs to the United States."  Id.  The "final instance" when

Velez and Arbane sold drugs to the Engineer was in December 2000.  Id. at 1226.

Just after the Engineer's arrest, Velez began cooperating with the United States government after he and his wife were charged with visa fraud.  Id. at 1228.  As a government informant, Velez taped phone conversations with Arbane.  Id.  In December 2001, Arbane met with Velez in Miami, Florida, and their conversation was recorded.  The recorded conversation makes clear that Arbane refused to import drugs into the United States, nor would Arbane agree to enter into any business, legal or otherwise, in the United States.  Specifically, Arbane told Velez that he did not want to do anything in Colombia, Mexico, or the United States.

Perhaps most importantly, Velez specifically testified that he and Mr. Arbane had no agreement to import drugs into the United States (or anywhere else) between October 2001 and January 2002.  Id. at 1227.  Velez testified that he and Arbane had discussions "towards the end of 2000" about possibly importing drugs to Miami, and that Velez and Arbane "would be the only people involved."  Id. at 1227 (emphasis in original).

In an attempt to avoid the import of Velez's testimony, the government argued on appeal that there were three other possible co-conspirators: "(1) Jose Lopez-Posada, the man renting the house [in Ecuador] where the drugs were found, (2) Luis Castillo Amen, Arbane's secretary in Ecuador, and (3) 'Rene,' one of Velez's contacts who could allegedly transport drugs out of Mexico."  Id. at 1228 (footnote omitted).  The court noted that the:

> only conspiracy charged in this case was a conspiracy to import drugs into the United States.  The venture or plan to which two culpable co-conspirators must have agreed is thus the importation of drugs into the United States.  Of course, conspiracy to possess drugs in Ecuador, to export drugs from Ecuador, or to distribute drugs in South America are not crimes in the United States.  The government was therefore obligated to prove that two co-conspirators agreed to a United States crime – to be precise, the crime charged in the indictment.

Id. at 1229-30 (citation and footnotes omitted).

Evaluating the evidence regarding the other three people proposed by the government as co-conspirators, the court rejected any of the three as possibilities. With respect to Lopez-Posada, the court found:

> In this case, the record is devoid of any evidence that Lopez-Posada knew of the existence of a plan to import the drugs into the United States, much less its purpose or his role in furtherance thereof. For instance, the recorded conversations between Velez and Arbane reveal an agreement between the two men to import drugs, but the only involvement of Lopez-Posada anywhere in these conversations is Arbane's mention that Lopez-Posada was guarding the house where the drugs were stored. Neither the conversations themselves, nor Velez's explanation of them during his testimony at trial, reveal an agreement by Lopez-Posada to import drugs into the United States. The fact that Lopez-Posada rented and guarded the house from Arbane does not support an agreement on Lopez-Posada's part to belong to a conspiracy to import drugs into the United States. Even if we could infer that Lopez-Posada knew that the drugs were leaving Ecuador, there was no evidence that Lopez-Posada knew they were headed to the United States.

Id. at 1231 (footnote omitted).

The court was equally emphatic in evaluating the evidence about Castillo Amen and Rene:

> This evidence is clearly insufficient to demonstrate that Luis Castillo Amen was a participant in or had knowledge of any criminal conspiracy, much less one alleged here.
>
> *      *      *
>
> Finally, at oral argument, the government argued for the first time that a "Rene" could be counted as a co-conspirator with Velez and Arbane. At trial, Velez testified that someone named Rene had a connection at a port in Mazatlan, Mexico and that Rene could send drugs from Mexico to the United States. However, rather than presenting evidence that Arbane and Rene were co-conspirators, the government's evidence was to the contrary. In the transcript of the December 23, 2001 conversation between Arbane and Velez, it is evident that Arbane rejected the offer of working with Rene; when Velez mentioned that he

6

had a friend who could help bring it, ostensibly referring to the ability of Rene to assist in bringing the drugs across the border, Arbane told him to "[f]orget about that."

Id. at 1234 (emphasis added).

Because the government "failed to meet" its burden to prove "that there existed a specific agreement between the defendant and at least one or more culpable co-conspirators to import narcotics into the United States," the court reversed the conviction.  Id. at 1233.  Therefore, on May 26, 2006, the district court in the SDF ordered that Mr. Arbane's conviction be vacated and that Mr. Arbane be released from the term of imprisonment entered in that case.

**E.      The Immigration Proceedings**

After the reversal of his conviction, Mr. Arbane was released from the custody of the Bureau of Prisons on May 26, 2006.  At that time, Mr. Arbane was detained and held by the Immigration and Customs Enforcement ("ICE") authorities.  In August 2006, Mr. Arbane was ordered removed from the United States.  A plane ticket was purchased on behalf of Mr. Arbane to effect his departure from the United States to Iran.  Mr. Arbane was scheduled to depart on September 28, 2006, from Dulles Airport to ultimately arrive in Tehran, Iran.  Instead, Mr. Arbane was brought to D.C. on September 28, 2006 – just seven days after he was indicted, and the very same day he had arrangements to leave the country.

**F.      The Present Case**

On September 21, 2006, the two-count indictment that is the subject of this motion was filed.  Count One charges that beginning in or about September 1999 until January 8, 2002, in the United States, Ecuador, and elsewhere, Mr. Arbane unlawfully, knowingly and intentionally conspired with others to knowingly and intentionally manufacture and distribute five kilograms

or more of cocaine, intending and knowing that the cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959,  963, 960(b)(1)(B)(ii) and 960(b)(1)(G)[2] and 18 U.S.C. § 2 and 3551 et. seq.  Count Two charges that on or about January 8, 2002, Mr. Arbane did unlawfully, knowingly and intentionally manufacture and distribute five kilograms or more of cocaine, intending and knowing that such substance would be unlawfully imported into the United States, in violation of 21 U.S.C. § 959(a).  The indictment also includes a forfeiture count under 21 U.S.C. § 853.

On September 29, 2006, Mr. Arbane made his initial appearance and was arraigned.  On October 4, 2006, the government's request for detention was granted.  Since that time, Mr. Arbane has been detained at the Correctional Treatment Facility.  Thus, he has now been in custody for over four years since his arrest in Ecuador.

## ARGUMENT

### I.    THE DOUBLE JEOPARDY CLAUSE BARS THE GOVERNMENT FROM CHARGING DEFENDANT WITH COUNT ONE OF THE INDICTMENT

Under the Double Jeopardy Clause, the government

is prohibited from putting a criminal accused twice in jeopardy for the same crime.  Benton v. Maryland, 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).  The primary idea underlying this prohibition is that a state must not be permitted "to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." Green v. United States, 355 U.S. 184, 187-88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

---

[2]  Violations of 21 U.S.C. § 960(b)(1)(G) involve 1000 kilograms or more of a mixture or substance containing a detectable amount of marihuana. It appears that reference to this provision is a mistake in the indictment, as the allegations in the indictment refer only to cocaine.

<u>Walck v. Edmondson</u>, 472 F.3d 1227, 1235 (10th Cir. 2007).  "When a defendant has been acquitted, the 'Clause guarantees that the state shall not be permitted to make repeated attempts to convict him.'" <u>Schiro v. Farley</u>, 510 U.S. 222, 230 (1994) (quoting <u>United States v. Wilson</u>, 420 U.S. 332, 343 (1979)).

 As part of its protections, the "Double Jeopardy Clause prevents the government from splitting a conspiracy into multiple offenses." <u>Untied States v. Alvarado</u>, 440 F.3d 191, 198 (4th Cir. 2006).  Put another way, the "Double Jeopardy Clause prohibits subdivision of a single criminal conspiracy into multiple violations of one conspiracy statute." <u>United States v. Smith</u>, 424 F.3d 992, 1000 (9th Cir. 2005) (quoting <u>United States v. Montgomery</u>, 150 F.3d 983, 989 (9th Cir. 1998)).

 Courts have developed a test, generally consisting of five parts, to determine whether "two conspiracy counts charge the same offense and so place the defendant in double jeopardy." <u>Smith</u>, 424 F.3d at 1000.  The five factors are: (1) the time periods covered by the alleged conspiracies; (2) the places where the conspiracies are alleged to have occurred; (3) the people charged as conspirators; (4) the overt acts alleged to have been committed or any other description of the offense alleged which indicate the nature and scope of the activities being prosecuted; and, (5) the substantive statutes alleged to have been violated.  <u>Alvarado</u>, 440 F.3d at 198; <u>Smith</u>, 424 F.3d at 1000.  <u>See</u> <u>also</u> <u>United States v. Singleton</u>, 177 F.Supp.2d 12, 21 (D.D.C. 2001).  This test is applied because of the danger that the government could "carv[e] up a single conspiracy to commit several crimes into separate prosecutions." <u>United States v. Laguna-Estela</u>, 394 F.3d 54, 57 (1st Cir. 2005).

9

A.    **The Time Periods Covered**

The Florida indictment, filed on September 18, 2003, charged Mr. Arbane with

conspiracy to import cocaine into the United States, alleging that the events took place between

October 2001 and January 8, 2002, in Miami-Dade County and elsewhere.  The present

indictment charges him in Count One with conspiracy to manufacture and distribute cocaine,

intending and knowing that it would be imported into the United States.  Count Two charges

defendant with a substantive count of manufacturing and distributing five kilograms or more of

cocaine, intending and knowing that it would be imported into the United States.  The activity in

Count One is alleged to have occurred from September 1999 to January 8, 2002, in the United

States, Ecuador, and elsewhere, while the events in Count Two are alleged to have occurred on

January 8, 2002.

Both conspiracies are alleged to have ended on the exact same date – January 8, 2002, the

date of Mr. Arbane's arrest in Ecuador.  While the conspiracy charged in this Court goes back

two years earlier than the one charged in Florida, the time period of the Florida case is wholly

encompassed within the present charge.  The evidence admitted at trial in Florida, through Velez,

was that Velez and Arbane began engaging in various illegal conduct throughout Central

America, South America, and Mexico which eventually resulted in drug transactions.  Arbane,

446 F.3d at 1226.  Specifically, Velez testified that in the year 2000, Velez and Arbane used the

Engineer to import drugs into the United States.  Id.  However, Velez admitted that once the

Engineer was arrested, any drugs could not be brought to the United States because the Engineer

was the only conduit for bringing the drugs to the United States.  Id. at 1227.  In addition, the

government conceded that June 2001 was the last time period in which Arbane, Velez, and the

Engineer had any agreement to bring drugs to the United States because the Engineer was arrested in June 2001 and he had no role or relationship with Velez or Arbane after his arrest. Id. at 1228. The fact that the entire time period of the SDF indictment is subsumed in the present indictment demonstrates that the two prosecutions are for the same conspiracy for purposes of double jeopardy.

### B.    The Places Where The Conspiracies Occurred

The Florida indictment alleges that the conspiracy took place in "Miami-Dade County in the Southern District of Florida, and elsewhere." The indictment in this case alleges that the conspiracy took place "in the United States, Ecuador, and elsewhere." The evidence at trial in Florida showed that the majority of the conspiracy occurred in Ecuador. There was testimony from Velez that Arbane traveled to Miami, Florida in 2001; however during this meeting Arbane specifically told Velez that he would not engage in any activity, legal or otherwise. It is clear that the government's evidence with regard to where the drugs were imported or stored and the alleged conspiracy will be the same testimony it presented at the Florida trial. The geographic locales of these charged conspiracies are identical. Thus, this factor also shows that the government has impermissibly split one conspiracy into two.

### C.    Participants in the Conspiracy

The only named person as a defendant or a participant in both the SDF and the present indictment is Mr. Arbane. Both indictments state that Mr. Arbane knowingly and intentionally combined, conspired, confederated and agreed with "other persons, known and unknown to the Grand Jury." Once again, it is clear that the government will rely upon the same testimony it presented in the SDF case, as to the alleged co-conspirators. Under the Eleventh Circuit's

opinion, there is really only one possible co-conspirator in addition to Velez, that being the Engineer.  The Eleventh Circuit held, as discussed above, that none of the other three possible co-conspirators posited by the government were culpable because there was no evidence that there was an agreement between any of them and Arbane to import drugs into the United States. Once again, the fact that both conspiracy charges include the exact same actors means that the conspiracy has been unlawfully split.

**D.     Overt Acts Alleged To Have Been Committed**

The indictments in both Florida and the District of Columbia do not allege any overt act. It is clear, however, as discussed above, that the nature and scope of the activities being prosecuted are identical to those in the SDF case.

**E.     Violation of Substantive Statutes**

The SDF indictment charged that Mr. Arbane knowingly and intentionally conspired with others to import into the United States five or more kilograms of cocaine, in violation of 21 U.S.C. § 952(a), 963 and 960(b)(1)(B).  The present indictment charges Mr. Arbane with unlawfully, knowingly and intentionally conspiring with others to knowingly and intentionally manufacture and distribute five kilograms or more of cocaine, intending and knowing that the cocaine would be unlawfully imported into the United States, all in violation of 21 U.S.C. § 959, 960(b)(1)(B)(ii).[3]  The only difference between the SDF indictment and the present indictment is that the former charges a conspiracy to import; while the latter charges a conspiracy to manufacture or distribute for the purpose of importation.   The elements of each of the offenses are listed below.

---

[3]  As discussed above, the reference to § 960(b)(1)(G) appears to be a mistake.

21 U.S.C. § 952(a): Elements of the Offense for Conspiracy to import into the United States <u>five (5) kilograms or more of cocaine</u>:

(1) An agreement between two of more persons to:

(2) Intentionally bring 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine into the United States from some place outside of the United States; and

(3) The defendant knew that the substance being imported was cocaine; and

(4) The defendant knew that he was importing cocaine into the United States.

21 U.S.C. § 959:  Elements of the offense for Conspiracy to manufacture & distribute five (5) kilograms or more of cocaine for the <u>purpose of unlawful importation</u>:

(1)  An agreement between two or more persons to:

(2)  Manufacture or distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine; and

(3) The defendant knew that the substance being manufactured or distributed was cocaine; and

(4) The defendant intended or knew that the cocaine will be unlawfully imported into the United States.

The only difference in the charges is, obviously, that the SDF indictment charged only conspiracy to import cocaine, while the present indictment charges conspiracy to manufacture cocaine for importation.  The crucial element of each offense, however, is that both charges require that there be a conspiracy to import the drugs into the United States.  The Eleventh Circuit in <u>Arbane</u> specifically held that there was no conspiracy to import drugs into the United States at all during the time period of October 2001 through January 8, 2002, regardless of whether the government now charges Mr. Arbane with just conspiracy to import or conspiracy to manufacture or distribute with the intent to import cocaine into the United States.  Therefore, if there was no agreement to import the drugs into the United States, there can be no agreement to manufacture or distribute the drugs with the intent to import the drugs into the United States.

13

In the present case, therefore, all five factors conclusively establish that the government has split one conspiracy into two in contravention of the Double Jeopardy clause. The government "wants to subject" Mr. Arbane to "successive decision-making by two different fact-finders in two trials." United States v. Calderone, 982 F.2d 42, 48 (2d Cir. 1992). This would require him to "run the gantlet twice, a result forbidden by the Double Jeopardy Clause." Id. Even where only "[f]our of the five factors" of the test "militate toward the existence of a single conspiracy," the splitting of a conspiracy is improper. United States v. Mann, 195 Fed. Appx. 430, 434-35 (6th Cir. 2006)(unpublished).

In two similar cases where a defendant was charged in the Southern District of Florida and, subsequently, another jurisdiction, courts have held that the Double Jeopardy Clause had been violated. United States v. Jarvis, 7 F.3d 404 (4th Cir. 1993); United States v. Singleton, 177 F. Supp.2d. 12 (D.D.C. 2001). In Jarvis, the conspiracy charged in the SDF took place over a four-day period, while the subsequent prosecution in the Eastern District of Virginia covered a three-year period, which "completely embraced the time period covered by" the first prosecution. 7 F.3d at 411. The events charged in the second prosecution took place "in the same place as the earlier conspiracy." Id. While Jarvis was the only co-conspirator charged in both indictments, the court had "no difficulty in concluding that" the co-conspirators "were in large measure the same for purposes of both conspiracy prosecutions." Id. The overt acts charged in the first indictment were included in the second indictment, and the substantive statutes charged in both indictments were the same. Id.

After evaluating the factors, the court concluded that there was "considerable similarity between the Florida prosecution and the Virginia prosecution." Id. at 412. Although Jarvis was

the only common defendant, "the same evidence, and the same principal players, were examined and their testimony deployed to obtain two convictions against Jarvis." Id. Because the second case was "simply an attempt to reprosecute the defendant for an offense of which he had already been convicted in the Southern District of Florida, ... Jarvis's conspiracy prosecution in the Eastern District of Virginia violated the Double Jeopardy Clause." Id. Notably, the court in Jarvis made its findings under the plain error standard, as the defendant had not objected before the second trial.

In Singleton, a case decided by Judge Friedman, the events charged in the second case in D.C. began two years earlier, but included the entire time period of the first case, and the "Florida prosecutors could easily have asked the grand jury there to have charged a conspiracy that began with the District of Columbia conspiracy." 177 F.Supp. 2d at 22. Thus, the "time overlap strongly suggest[ed] that the two prosecutions are for the same conspiracy offense for purposes of double jeopardy analysis." Id. The D.C. indictment mentioned Florida, and the evidence introduced at the first trial led the court to conclude that the "overlap of the geographic locales of the two charged conspiracies demonstrates that these are one and the same conspiracy, not two separate conspiracies." Id. at 23.

While Singleton was the only defendant named in both indictments, the testimony in the first case revealed that the same people were involved as co-conspirators in both cases, and the "overlap of core members in the Florida and District of Columbia conspiracies ... strongly suggests that both indictments charged the same offense for double jeopardy purposes." Id. Although the Florida indictment included no overt acts, the acts charged in the D.C. indictment showed the "commonality of the 'core' allegations in the District of Columbia indictment and the

15

proof actually presented at Singleton's conspiracy trial in Florida demonstrate that only one conspiracy exists." Id. at 25. Both indictments charged the same statutory provisions. Id. at 26.

The court thus concluded that "under the totality of the circumstances test," the second indictment had to be dismissed. Id. at 22. Both Singleton and Jarvis compel the same conclusion in the present case. Because the present indictment is for the same offense, it must be dismissed because a second trial would violate defendants rights under the Double Jeopardy clause.

The two indictments in the present case involve conspirators who were "committed to the same objectives and consequently were members of a single conspiracy." United States v. Smith, 82 F.3d 1261, 1269 (3d Cir. 1996). Because the activities charged in both cases are "independent or mutually supportive to any degree, the inference becomes compelling that the participants are involved in but one conspiracy." Id.

In addition to the analysis of the five factor test to determine whether there was one agreement or more than one, and hence one conspiracy or separate conspiracies under the Double Jeopardy doctrine, the Court should also consider that the government's attempted retrial of Mr. Arbane for the exact same conduct alleged in the Florida indictment is contrary to the holding in Burks v. United States, 437 U.S. 1 (1978). The Court in Burks held that the Double Jeopardy Clause precludes retrial "once the reviewing court has found the evidence legally insufficient" to support a conviction. In Burks, the Court explained that "the government's case was so lacking that it should not have been even been submitted to the jury." Id. at 16. Therefore, Burks implements the principle that "[t]he Double Jeopardy Clause forbids a second trial for the purposes of affording the prosecution another opportunity to supply evidence which it failed to muster in the

16

first proceeding." Id. at 11.  See also Piaskowski v. Bett, 256 F.3d 687 (7th Cir. 2006)(Under

Burks, the State may not retry defendant without offending the Double Jeopardy Clause).

Therefore, the government should not be allowed to supply evidence it failed to put forward at

the time of the trial in Florida.

## II.    THE DOCTRINES OF COLLATERAL ESTOPPEL AND THE STATUTE OF LIMITATIONS BAR THE GOVERNMENT FROM CHARGING DEFENDANT WITH COUNT ONE OF THE INDICTMENT

The collateral estoppel doctrine is a separate component of the Fifth Amendment

guarantee against double jeopardy.  See Ashe v. Swenson, 397 U.S. 436, 445 (1970).  As the

Court in Ashe explained, collateral estoppel "means simply that when an issue of ultimate fact

has once been necessarily determined by a valid and final judgment, that issue cannot be litigated

between the same parties in any future lawsuit." Id. at 443.  If an issue essential to the

prosecution's case in the second trial has necessarily been decided for the defendant in the first

trial, then the Ashe rule applies.  See United States v. Bowman, 609 F.2d 12, 17 (D.C. Cir.

1979).  Further, the collateral estoppel effect attributed by the Double Jeopardy Clause may bar a

later prosecution for a separate offense where the government has lost an earlier prosecution

involving the same facts.  See United States v. Dixon, 509 U.S. 688, 705 (1993).  The burden is

placed upon the defendant to demonstrate that the issue whose re-litigation he seeks to foreclose

was actually decided in the first proceeding.  See Dowling v. United States, 493 U.S. 342, 350-1

(1990).  Collateral estoppel is known in "modern usage" as "issue preclusion."  Schiro v. Farley,

510 U.S. at 232.

This Circuit in Milton S. Kronheim & Co. v. District of Columbia, 91 F.3d 193, 197

(D.C. Cir. 1997) determined that three conditions must be satisfied before a party can be

17

estopped from re-litigating an identical issue previously decided.  The three conditions are: (1) the issue must have been actually litigated; (2) the issue must have been actually and necessarily determined by a court of competent jurisdiction; and (3) preclusion in the second trial must not work an unfairness.  Id.  See also United States v. Stoddard, 111 F.3d 1450, 1458 (9th Cir. 1997) (setting forth three-part inquiry to determine whether collateral estoppel bars a second action between two parties; (1) were the issues in the two cases sufficiently similar; (2) was the issue fully litigated in the first action; and (3) was the issue necessarily decided in the first action); see also United States v. Hernandez, 572 F.2d 218, 220 (9th Cir. 1978) (defining three-pronged collateral estoppel inquiry).

As discussed above, the Eleventh Circuit ruled that the evidence was insufficient to show that anyone other than a government informant was involved in the alleged conspiracy with Mr. Arbane during the time period of June 2001 through January 8, 2002.  The government conceded that Velez, a government informant during the relevant time period, could not be a co-conspirator because of his status as a government informant.  Id. at 1228.  Also, the government conceded that the Engineer was not a member of the charged conspiracy because there was no evidence that there was a continuing role or interest in a relationship with Arbane and Velez after the Engineer was arrested in June 2001.  Id.  The government also asserted a possibility of three other co-conspirators -  Jose Lopez-Posada, Luis Castillo Amen, and Rene - all of whom the Eleventh Circuit rejected as possible co-conspirators to import drugs into the United States.  Id. at 1229-33.  In sum, the Eleventh Circuit concluded that the government failed to meet its burden that there existed a specific agreement between Mr. Arbane and at least one or more culpable co-conspirators to import drugs into the United States.  Id. at 1233.

18

Obviously, the issue of whether anyone other than a government informant was involved in the alleged conspiracy was previously litigated – indeed, it was the only issue decided on appeal – and it was determined by the Eleventh Circuit that there were no other culpable co-conspirators involved to import drugs into the United States from June 2001 through January 8, 2002. In addition, there is no "unfairness" here because the government exhausted the possibility of three other co-conspirators, one of which they did not raise until oral argument. The government can not get another "bite at the apple" by re-litigating issues previously rejected by the Eleventh Circuit. And it would be unfair to Mr. Arbane to allow the government to re-litigate the issue. Because the three-part test to establish collateral estoppel has been met in this case, the government is precluded from re-litigating the findings made by the Eleventh Circuit that determined there was no agreement between Arbane and at least one culpable co-conspirator to import drugs into the United States during the time period of October 2001 through January 8, 2002. Therefore, this very issue can not be re-litigated by the government in the present case. This case is in a unique posture because of the detailed opinion by the Eleventh Circuit, so the "record establishes that the issue was actually and necessarily decided in the defendant's favor." Schiro v. Farley, 510 U.S. at 236. See also United States v. Stoddard, 111 F.3d 1450 (9th Cir. 1997) (collateral estoppel bars the government from re-litigating the issue of whether defendant owned an amount of money).

Because of the collateral estoppel effect of the Eleventh Circuit's decision, the statute of limitations precludes the government from filing an indictment charging Mr. Arbane with conduct that occurred over five years ago. Title 18 U.S.C. § 3282, provides:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

The Eleventh Circuit determined that there was no conspiracy to import drugs into the United States at least as of June 2001. 446 F.3d at 1228. According to the testimony of Velez, the Engineer was the only conduit by which drugs were brought to the United States. Id. at 1227. Therefore the latest date in which the government could claim Arbane and Velez conspired to import drugs into the United States is June 2001, when the Engineer was arrested and detained. Id. at 1227-8.

Because Mr. Arbane was indicted and charged in this indictment on September 21, 2006, the five-year statute of limitations has expired. See 18 U.S.C. § 3282. Using the date of June 2001 as the end date in which an alleged conspiracy occurred, the government had to bring charges against Mr. Arbane within five years of this date, or June 2006. Therefore, because the indictment in this Court was brought at least three months after the expiration of the five-year period of limitations, the conspiracy charge in Count One of the indictment is barred from prosecution, and must be dismissed.

## III.    THE INDICTMENT SHOULD BE DISMISSED ON THE GROUNDS OF VINDICTIVE PROSECUTION

The Supreme Court has held that neither a prosecutor nor a judge may act vindictively against a person for having successfully appealed a prior conviction. See Blackledge v. Perry, 417 U.S. 21 (1974); North Carolina v. Pearce, 395 U.S. 711 (1965). The Court held that when a prosecutor obtains heightened charges after a defendant successfully appeals his conviction, there is a "realistic likelihood of 'vindictiveness.'" Blackledge, 417 U.S. at 27. "To punish a person

because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the [United States] to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.'" Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978).

"Prosecutorial vindictiveness" is a term that refers to a situation in which the government acts against a defendant in response to the defendant's prior exercise of constitutional or statutory rights.  See United States v. Goodwin, 457 U.S. 368, 372 (1982).  In order to insure that a person considering an appeal will not be unduly concerned about a possible increase in punishment, the Supreme Court has also held that in situations where there is a realistic likelihood of vindictiveness, prosecutors may not increase the charges originally pursued, except upon information which comes to light after the original conviction.  Goodwin, 457 U.S. at 381.

The Supreme Court has established two ways in which a defendant may demonstrate prosecutorial vindictiveness.  First, a defendant may show "actual vindictiveness."  This can be proved through objective evidence that a prosecutor acted in order to punish the defendant for standing on their legal rights.  Id. at 380-81.  Second, a defendant may "in certain circumstances rely on a presumption of vindictiveness: when the facts indicate a 'realistic likelihood of vindictiveness,' a presumption will arise obliging the government to come forward with objective evidence justifying the prosecutorial action."  See Blackledge v. Perry, 417 U.S. at 27-29.

To invoke a presumption of vindictiveness, there must be a finding that a reasonable likelihood of vindictiveness exists – that is, that the second indictment was "more likely than not

attributable to the vindictiveness on the part of" the Government.  See Alabama v. Smith, 490

U.S. 794, 801 (1989).  As the D.C. Circuit has explained:

> The doctrine of prosecutorial vindictiveness developed as a corollary to the
> vindictiveness doctrine that precludes, as a matter of due process, imposition by a
> judge of a more severe sentence upon retrial after a defendant has successfully
> exercised a constitutional right or pursued a statutory right of appeal or collateral
> attack.  In the prosecutorial context, the doctrine precludes action by a prosecutor
> that is designed to penalize a defendant for invoking any legally protected right
> available to a defendant during a criminal prosecution.  To prove actual
> vindictiveness requires "objective evidence" that the prosecutor's actions were
> designed to punish a defendant for asserting his rights.  Such a showing is
> normally "exceedingly difficult to make."  Because the underlying concern is not
> whether a prosecutor has acted maliciously or in bad faith, but whether "the fear
> of [prosecutorial] vindictiveness may unconstitutionally deter a defendant's
> exercise of [a constitutional or statutory right]," id. (quotation omitted), a
> presumption of vindictiveness may be warranted "in cases in which a reasonable
> likelihood of vindictiveness exists."  The government may overcome the
> presumption with "objective information in the record justifying the increased
> sentence [or charges]."  "If the government produces such evidence, the [criminal]
> defendant's only hope is to prove that the justification is pretextual and that actual
> vindictiveness has occurred."

Maddox v. Elzie, 238 F.3d 437, 446 (D.C. Cir. 2001) (citations omitted) (changes in original).

See also, United States v. Gary, 291 F.3d 30, 34 (D.C. Cir. 2002).

In this jurisdiction, Mr. Arbane faces an additional charge that he did not face in the

Southern District of Florida.[4]  Count Two of the indictment alleges that on or about January 8,

2002, Mr. Arbane did unlawfully, knowingly and intentionally manufacture and distribute 5

kilograms or more of cocaine, intending and knowing that such substance would be unlawfully

imported into the United States, in violation of 21 U.S.C. § 959(a).  The conduct that occurred on

---

[4]  On May 24, 2004, the government dismissed the forfeiture count of the Florida
Indictment; however, there is now a forfeiture provision contained in the indictment before this
Court.  The forfeiture provision furthers the argument that this indictment is a product of
vindictive prosecution.

January 8, 2002, has been known to the government since his arrest. Not only was he tried in Ecuador based on the same charge, his arrest and the cocaine found in the apartment were a major component of the government's evidence in the case in the SDF.

For several reasons, there is a presumption of vindictiveness in this case. The facts upon which the government relied in the Southern District of Florida are the exact same facts that the government will rely upon in prosecuting Mr. Arbane in this Court. Further, the two indictments in the present case were brought by the same sovereign. The prosecutors, all employees of the Department of Justice, have collectively collaborated as to how to proceed in this case. The conduct of the government as a whole regarding vindictive prosecution should be focused on, rather than on the conduct or retributive sentiments of a single prosecutor. See Thigpen v. Roberts, 468 U.S. 27, 31-32 (1984) and Blackledge, 417 U.S. at 31.

With regard to the increase in charges, in United States v. Jamison, 505 F.2d 407, 417 (D.C. Cir. 1974), the D.C. Circuit held that absent any showing of justification for the increase in the degree of the crime charged, defendants were denied due process of law. See also, United States v. Meyer, 810 F.2d 1242, aff'd en banc, 824 F.2d 1240 (1987) (presumption of vindictiveness when superseding indictment filed for purposes of punishing protestors who invoked right to trial by jury); United States v. Velsicol Chemical Corp., 498 F.Supp. 1255 (D.D.C. 1980) ("Limits of acceptable exercise of prosecutorial discretion in charging decisions are exceeded when prosecutor threatens defendant with increased charges and then 'ups-the-ante' without adequate justification"); United States v. Quintana, 695 F.Supp. 24 (D.D.C. 1988) (motion to dismiss granted when government did not give reasons for filing new indictment charging additional offense.); United States v. Cady, 955 F.Supp. 164 (N.D.N.Y. 1997)

(government could not rebut presumption that indictment was product of vindictive prosecution absent any objective evidence demonstrating that government decided to re-indict defendant without regard to his motion to modify his sentence on a prior conviction).

"When, as in this case, the government chooses not to lodge charges for a period of time and then makes the decision to prosecute so close after a defendant elects to exercise his rights in the face of prosecution opposition, apparent vindictiveness is clearly established." See United States v. Velsicol Chemical Corp., 498 F.Supp. at 1264-65.  In this Court, Mr. Arbane was not indicted until September 26, 2006, five months after the Eleventh Circuit overturned his conviction, and just before he was about to be deported.  Strangely, during this five month time period, Mr. Arbane was not brought back to the Northern District of New York where charges against him are still pending – rather, he was placed into the custody of the immigration authorities.  In August 2006, the immigration authorities ordered that Mr. Arbane be removed from the United States.  A plane ticket was purchased to effect this and he was scheduled to depart on September 28, 2006, from Dulles.  However, Mr. Arbane was instead  brought to D.C. on September 28, 2006, pursuant to the present indictment.

In addition, the Court should also consider that the current prosecution of Mr. Arbane is in violation of the government's Petite Policy.  See U.S. Attorneys' Manual 9-2.031(A), Dual and Successive Prosecution Policy.  Defendant recognizes that the Petite Policy is not binding upon the Court, but it clearly establishes guidelines as to whether the government should  bring a federal prosecution based on substantially the same act(s) or transactions involved in a prior federal proceeding.  Id.  See Rinaldi v. United States, 434 U.S. 22, 27 (1977); Petite v. United States, 361 U.S. 529 (1960).    A component of the Petite Policy is to "protect persons charged

with criminal conduct from the burdens associated with multiple prosecutions and punishments

for substantially the same act(s) or transaction(s), to promote efficient utilization of Department

resources, and to promote coordination and cooperation between federal and state prosecutors."

See U.S. Attorneys' Manual 9-2.031(A), Dual and Successive Prosecution Policy.

　　　　The presumption of vindictiveness in the present case is clear.  Because there is no

objective evidence to overcome the presumption, the indictment should be dismissed.

## CONCLUSION

　　　　Defendant respectfully requests that Count One of the Indictment be dismissed as the

government has impermissibly split one conspiracy into two in violation of the Double Jeopardy

Clause.  In addition, Count One should be dismissed, as the prosecution is precluded by collateral

estoppel and the statute of limitations.  Finally, Mr. Arbane submits that Count Two of the

indictment and the forfeiture allegation should be dismissed on vindictiveness grounds.  To the

extent the government disputes any of the factual background or allegations set forth in this

motion, defendant respectfully requests an evidentiary hearing.


　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　/s/

　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　A.J. KRAMER
　　　　　　　　　　　　　　FEDERAL PUBLIC DEFENDER
　　　　　　　　　　　　　　DANIELLE JAHN
　　　　　　　　　　　　　　ASSISTANT FEDERAL PUBLIC DEFENDER
　　　　　　　　　　　　　　625 Indiana Avenue, N.W., Suite 550
　　　　　　　　　　　　　　Washington, D.C.  20004
　　　　　　　　　　　　　　(202) 208-7500

25